IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 5, 2019 Session

## CHRIS WHITNEY v. FIRST CALL AMBULANCE SERVICE, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 15C1241 Thomas W. Brothers, Judge**

_____

### No. M2018-01155-COA-R3-CV

_____

This is an appeal from the trial court's grant of summary judgment dismissing a plaintiff-employee's THRA and TPPA claims against his employer. As to the employee's THRA claim, the trial court found that the evidence of harassment and discriminatory conduct was not so severe or pervasive so as to establish a hostile work environment. As to the employee's TPPA claim, the trial court found that the employer had a valid, non-discriminatory reason for termination. Additionally, the trial court found that the employee failed to establish that one of the entities was his employer for purpose of liability under either the THRA or the TPPA. Finding that the employee presented sufficient evidence to raise a genuine issue of disputed material fact with regard to his THRA and TPPA claims, we vacate the trial court's order as to these claims and remand the case to the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in part and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

R. Patrick Parker and Abigail M. Strader, Gallatin, Tennessee, for the appellant, Chris Whitney.

First Call Ambulance Service, LLC, Appellee[1]

_____

[1] No brief was filed on behalf of Appellee First Call Ambulance Service, LLC.

# OPINION

## BACKGROUND AND PROCEDURAL HISTORY

In January 2011, First Call Ambulance Services ("First Call") hired Chris Whitney ("Plaintiff") as the ambulance fleet manager for the company's Tennessee and Virginia regions. Later that same year, First Call was acquired by EDG Partners, LLC ("EDG"). As fleet manager, Plaintiff performed maintenance on the ambulance fleets and ensured that enough ambulances were available for the daily schedule. Throughout his employment, Plaintiff made several complaints to members of First Call's upper-level management as well as state regulators regarding the company's failure to adhere to the relevant safety rules and regulations promulgated by the State of Tennessee. On one occasion, Plaintiff told Mike Ross, First Call's CEO, that he "was going to tell the truth" about First Call's violations. In response, Mr. Ross assaulted Plaintiff. According to First Call's Human Resources Manager, Nina Mothershed, Mr. Ross struck Plaintiff in the face and grabbed him by the throat. On February 10, 2015, Plaintiff was terminated from his employment with First Call.

On March 31, 2015, Plaintiff filed a complaint in the Davidson County Circuit Court (the "trial court") against First Call and EDG (together, "Defendants"), alleging violations of the Tennessee Public Protection Act ("TPPA") and the Tennessee Human Rights Act ("THRA"). As to his TPPA claim, Plaintiff complained that he suffered continuous harassment and retaliation after he notified Defendants of safety violations regarding the ambulance fleets he oversaw. As to his THRA claim, Plaintiff complained that Defendants engaged in and condoned harassment and discriminatory conduct such that it created a hostile work environment. On May 7, 2015, EDG moved to dismiss Plaintiff's complaint, which the trial court denied on June 26, 2015.

On December 13, 2017, Defendants together moved for summary judgment as to both claims for relief. As to Plaintiff's THRA claim, Defendants argued that Plaintiff could not establish a hostile work environment existed because he made jokes about his race himself. Moreover, Defendants argued that it is undisputed that Plaintiff failed to report any alleged harassment or discriminatory conduct, despite the existence of clear reporting policies. As to Plaintiff's TPPA claim, Defendants argued that Plaintiff could not show that he engaged in any protected activity and that, even if he could, he could not establish an exclusive causal connection between any alleged protected activity and his termination. In support of this argument, Defendants argued that they had multiple legitimate and non-retaliatory reasons for terminating Plaintiff. Defendants further averred that an independent consulting firm that they had retained had notified them in a report (the "Solstice Report") of a variety of issues concerning Plaintiff's performance as fleet manager for First Call. Lastly, EDG argued that it was entitled to summary judgment on the additional basis that it was not Plaintiff's employer—which is a necessary precondition to liability under the THRA and TPPA.

In his response to the Defendants' motion for summary judgment, Plaintiff argued that he was an employee of both First Call and EDG and that he had made numerous complaints to management about ambulance units being operated in violation of state regulations. Additionally, Plaintiff argued that the Solstice Report on which Defendants relied for his termination was misleading and not worthy of belief. Nevertheless, on February 16, 2018, the trial court granted Defendants' motion for summary judgment. In its order, the trial court found that Plaintiff failed to establish that EDG was either a joint employer or single employer with First Call. As to Plaintiff's THRA claim, the trial court found that the evidence of harassment and discriminatory conduct offered by Plaintiff occurred over a period of 4 years and was, therefore, insufficient to establish a hostile work environment. As to Plaintiff's TPPA claim, the trial court found that Plaintiff failed to present evidence raising a genuine issue of material fact regarding First Call's reliance on the Solstice Report in reaching its decision to terminate Plaintiff. Plaintiff timely appealed on June 21, 2018. Plaintiff, however, did not pursue his claims against EDG on appeal.

## ISSUE PRESENTED

As we perceive it, Plaintiff raises one issue on appeal: whether the trial court erred in granting Defendants' motion for summary judgment as to First Call.

## STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (quoting Tenn. R. Civ. P. 56.04). Further:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense.

*Id.* at 264. When a properly supported motion is made, "the nonmoving party may not rest upon the mere allegations or denial of [its] pleading, but must respond, and by affidavits or one of the other means provided in [Tennessee Rule of Civil Procedure 56], set forth specific facts at the summary judgment stage showing that there is a genuine issue for trial." *Id.* at 265 (internal quotations omitted).

"We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Id.* at 250. "In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).

## DISCUSSION

As is relevant to this appeal, in granting Defendants' motion for summary judgment, the trial found that Plaintiff failed to raise genuine issues of material fact with respect to his THRA and TPPA claims against First Call. We address each in turn.

## THRA Claim

The stated intent and purpose of the THRA is to provide for the execution of policies within Tennessee that are consistent with the Federal Civil Rights Acts of 1964, 1968, and 1972, including, as relevant here, the prohibition of discrimination in employment. *See* Tenn. Code Ann. § 4-21-101(a)(1). Both the Federal and State Acts apply to claims of discrimination based upon the existence of a hostile work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (hereinafter, "*Campbell II*"). As this Court has noted, to prevail in a hostile work environment claim based on race, the plaintiff must prove four factors:

> (1) membership in a protected class; (2) racially motivated conduct that constituted an unreasonably abusive or offensive work-related environment or which adversely affected the reasonable employee's ability to do his or her job; (3) the employer knew or should have known of the harassment; and (4) the employer failed to respond with prompt and appropriate corrective action.

*Freeman v. Lewisburg Hous. Auth.*, M2006-01898-COA-R3-CV, 2008 WL 360607, at *5 (Tenn. Ct. App. Feb. 8, 2008) (citing *Campbell II*, 919 S.W.2d at 31-32). Further, a hostile work environment claim is established upon proof of conduct that is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Vinson*, 477 U.S. at 67 (internal quotation omitted). As the Tennessee Supreme Court stated in *Campbell II*,

> [i]n determining whether an environment is hostile or abusive, a court must consider the totality of the circumstances. While no single factor is required or conclusive, considerations relevant to the determination include, but are not limited to, the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the employee's psychological well-being.

*Campbell II*, 919 S.W.2d at 32 (internal citations omitted).

As to Plaintiff's THRA claim, the trial court found that, while "disgusting and offensive," the five alleged utterances offered into evidence by Plaintiff occurred over a period of four years. Specifically, the trial court found that "the utterances alleged by Plaintiff were infrequent, not physically threatening, and did not unreasonably interfere with Plaintiff's work performance." We disagree.

In its order, the trial court listed the five statements offered into evidence by Plaintiff:

(1) someone referred to Plaintiff as a "chink"; (2) during a budget meeting, other First Call employees told Plaintiff his abacus is "jacked up"; (3) someone placed a sign on Plaintiff's office door that referenced free cats as free lunch for Plaintiff; (4) someone stated that Plaintiff should not go out while the United States President was in Nashville because Plaintiff looked like a terrorist; and (5) someone asked Plaintiff how he would communicate with his relatives in North Korea while the internet was down in that country.

While the trial court found that these offensive statements were made over a period of four years, our review of the record reveals that the timing of the statements was that most of them were made in the last quarter of 2014—just a few months before his termination. Additionally, we are of the opinion that the trial court failed to fully appreciate the severity of the harassment and discriminatory conduct alleged by Plaintiff. While the trial court noted that "someone referred to Plaintiff as a 'chink,'" this downplays the fact that Plaintiff alleged the "someone" was actually a person in upper-level management at First Call and that the full offensive statement was "if I catch the damn chink out there talking to the state inspector one more time, he's going to regret it." The trial court also found that the statements were not physically threatening and did not unreasonably interfere with Plaintiff's work performance, yet the trial court failed to consider whether the statements were humiliating in nature. Plaintiff alleged that one member in upper-level management at First Call routinely made humiliating and embarrassing remarks to Plaintiff regarding his Asian background, such as: "Someone has cats for sale, maybe that could be dinner for you"; "You better not get out[,] you look like a terrorist"; and "How are you going to Skype your relatives in North Korea without the internet." In light of the foregoing, we conclude that there is a genuine issue of disputed material fact as to whether the discriminatory conduct alleged by Plaintiff was sufficiently severe or pervasive to create a hostile working environment. Accordingly,

we vacate the trial court's grant of summary judgment to Defendant First Call on this ground.

**TPPA Claim**

The TPPA declares in relevant part that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). Any employee terminated in violation of that part "shall have a cause of action against the employer for retaliatory discharge." *Id.* at § 50-1-304(d)(1). As this Court has noted, to establish a *prima facie* case of retaliatory discharge under the statute, the plaintiff must prove four elements: "(1) his status as an employee; (2) his refusal to participate in, or remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination by the employer." *Freeman*, 2008 WL 360607, at *3. An employee who establishes a *prima facie* case of retaliatory discharge creates a rebuttable presumption that the employer unlawfully retaliated against the employee. *Jones v. City of Union City*, No. 2013-02358-COA-R3-CV, 2015 WL 9257815, at *6 (Tenn. Ct. App. Dec. 17, 2015) (citing *Williams v. City of Burns*, 465 S.W.3d 96, 115 (Tenn. 2015)). The burden then shifts to the employer to articulate a non-retaliatory reason for the discharge. *Jones*, 2015 WL 9257815, at *6. As the Tennessee Supreme Court noted in *Williams v. City of Burns*, the "sole causation" element of a TPPA claim has an important impact at this stage:

> In articulating a non-retaliatory reason for discharging the employee, the defendant employer in a TPPA case need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment. Rather, the employer need only introduce admissible evidence showing that unlawful retaliation was not the *sole* cause of the employment action. That is, the employer must proffer evidence that, even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well.

*Williams*, 465 S.W.3d at 115. Once the employer proffers a non-retaliatory reason for the employee's discharge, the employee must have a full and fair opportunity to demonstrate that the employer's reasons are pretextual and that unlawful retaliation was the true reason for the challenged employment action. *Id.* at 118.

Here, the trial court found that First Call proffered three non-retaliatory reasons for Plaintiff's discharge: (1) the Solstice Report detailing concerns regarding Plaintiff's conduct and performance in his position; (2) employee complaints about Plaintiff; and (3) certain personality conflicts between Plaintiff and First Call management. The trial court addressed each reason as follows:

With respect to the personality conflicts and employee complaints, the Court finds that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact. However, Plaintiff has failed to present evidence raising a genuine issue of material fact regarding First Call's legitimate reliance on the independent consultant's report in reaching its decision to terminate Plaintiff's employment. Plaintiff has not presented evidence suggesting that the independent consultant's report was not a basis for his termination, that the report was a sham, or that the report was in some way manipulated by First Call.

Accordingly, the trial court concluded that Plaintiff failed to establish that the exclusive cause of his termination was alleged protected activity under the TPPA.

Plaintiff, however, argues that a genuine issue of material fact exists as to whether First Call's reliance on the Solstice Report was pretextual. This Court has noted that an employee can demonstrate that an employer's proffered, non-retaliatory reason for an adverse employment action is pretextual "by revealing the 'weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's explanation." *Wilson v. Rubin*, 104 S.W.3d 39, 50-51 (Tenn. Ct. App. 2002) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)). Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact; (2) establishing that the proffered reasons did not actually motivate the adverse employment action; or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action. *Wilson*, 104 S.W.3d at 51 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Here, Plaintiff proffered evidence alleging that the Solstice Report—as well as First Call's reliance on it—was "false, misleading and not worthy of belief, a sham". For example, the Solstice Report states that "[Plaintiff's] decision to extend intervals between oil changes beyond industry accepted standards was made independent of executive directive" and was "likely highly detrimental" to the company. In his March 19, 2018 affidavit, however, Plaintiff stated that on multiple occasions he was directed by upper management of First Call to cease purchasing oil and other maintenance parts due to the company's lack of funds. Similarly, the Solstice Report states that Plaintiff, acting on behalf of First Call, but without a clear directive from upper management, would purchase chassis and ambulance bodies for on-site remounting and/or spare engine replacement, ultimately concluding that this was not "strategically sound for business." Yet Plaintiff stated that he was under direct orders from upper-level management at First Call to get the ambulance fleet operational as quickly and cost-effectively as possible. Moreover, Plaintiff stated that First Call "flew [him] to California and St. Louis for the purpose [of] looking at more used ambulances and purchasing more cabs and chassis to perform remounts."

In their statement of undisputed material facts accompanying the motion for summary judgment, Defendants, relying on the Solstice Report, stated that "First Call's fleet maintenance costs per unit for its operations in Tennessee . . . were substantially higher than the maintenance costs per unit for First Call's 'E.M.T.' division in Ohio, despite the E.M.T. having an older fleet of ambulances." However, in his January 19, 2018 affidavit, Plaintiff provided an explanation for why such a comparison was misleading and inaccurate:

> EMT Ohio had more gas operated vehicles such as cars and vans that were used to transport clients than diesel operated ambulances. First Call had far more diesel operated ambulances than EMT Ohio. These diesel operated ambulances have a much higher per unit maintenance cost than gas operated vehicles. Furthermore, we operated our fleet in metropolitan areas as opposed to rural areas, such as where Ohio EMT operated, which further increased the per unit cost.

Additionally, in the statement of undisputed material facts, Defendants listed multiple issues concerning Plaintiff—brought to their attention by the Solstice Report—which raised "serious concerns and doubt as to whether [Plaintiff] was the right person for the Fleet Manager position moving forward[.]" For example, Defendants noted the "pattern of decisions made by [Plaintiff] that exceeded his authority as First Call's Fleet Manager[.]" In his January 19, 2018 affidavit, however, Plaintiff countered that "[a]ny decision to spend more than $5,000 had to be approved by the CEO" and that he had "obtained proper approval each time[.]" Referring to the Solstice Report's conclusion that Plaintiff's "personal passion" of purchasing chassis and ambulance bodies for on-site remounting and/or spare engine replacement was not "strategically sound for the business[,]" Defendants noted that Plaintiff's "personal goals and agenda for fleet maintenance [were] contrary to First Call's best interests[.]" Plaintiff, however, disputed this in his affidavit, stating that he never relayed such a "passion" or "goals" to First Call or the consulting firm: "I made the comment to Solstice that given the budgetary constraints and skill sets we had, that we could bring more revenue in by simply servicing ambulances and police cars from different counties or services in lieu of having ownership[.]" Moreover, as set out above, Plaintiff stated that First Call "flew [him] to California and St. Louis for the purpose [of] looking at more used ambulances and purchasing more cabs and chassis to perform remounts." In spite of Plaintiff's affidavit disputing the factual underpinning of the Solstice Report, the trial court inexplicably found that "the Plaintiff has failed to present evidence raising a genuine issue of material fact regarding First Call's legitimate reliance on the independent consultant's report in reaching its decision to terminate Plaintiff's employment."

"Summary judgment is inappropriate if there is any doubt concerning the existence of a genuine issue of material fact, and the court may only award summary judgment when a reasonable person could only come to one conclusion based on the facts

- 8 -

and inferences drawn from those facts." *Newell v. First State Bank, Inc.*, No. W2017-01209-COA-R3-CV, 2017 WL 6063115, at \*2 (Tenn. Ct. App. Dec. 12, 2017). Considering the evidence proffered by Plaintiff, a reasonable person could conclude that the Solstice Report—and First Call's reliance on it—have "no basis in fact" or were "insufficient to motivate the adverse employment action." *Wilson*, 104 S.W.3d at 51. Therefore, we conclude that there exists a genuine issue of material fact as to whether First Call's reliance on the Solstice Report for Plaintiff's termination was pretextual. Accordingly, we also vacate the trial court's grant of summary judgment to Defendant First Call on this ground.

## CONCLUSION

For the foregoing reasons, the trial court's summary judgment order is vacated with respect to Plaintiff's THRA and TPPA claims against First Call, and the case is remanded for further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

**CHRIS WHITNEY v. FIRST CALL AMBULANCE SERVICE, ET AL.**

**Circuit Court for Davidson County**
**No. 15C1241**

_____

**No. M2018-01155-COA-R3-CV**
_____

**ORDER**

On April 15, 2019, this Court filed its Opinion and Judgment in this appeal. On April 25, 2019, Appellant and Intervenor EDG Partners, LLC, filed a "Joint Petition of Appellant Chris Whitney and Non-Party Intervenor EDG Partners, LLC, to Correct Opinion and Judgment Regarding Parties to the Appeal" and, additionally, EDG filed an "Unopposed Motion for Leave to Intervene for Purposes of Jointly Petitioning to Correct Opinion and Judgment Regarding Parties to the Appeal". We construe both filings as a petition for rehearing (the "Joint Petition") pursuant to Tennessee Rule of Appellate Procedure 39. In the Joint Petition, Appellant and EDG ask this Court to clarify: (1) that EDG is not a party to this appeal and that First Call is the only appellee; and (2) that the trial court's summary judgment order is vacated and remanded only as to First Call and not EDG.

Counsel for Appellant asserts in the Joint Petition that he "mistakenly included a brief argument" in his appellate brief indicating that the trial court erred in granting

summary judgment to EDG on the grounds that Appellant failed to produce sufficient evidence to demonstrate that EDG was a joint employer. Appellant's argument, however—spanning nearly two pages—addresses the following issue he explicitly raised for this Court to review: "Did the Trial Court err in holding that First Call Ambulance Service and EDG Partners, LLC were not joint employers for the purposes of Plaintiff's causes of action?" Under the section of the brief titled "EDG Had Sufficient Control Over the Day-to-Day Operations of First Call To Be Considered an Employer," Appellant argued the following, in relevant part:

Viewing the facts in favor of the non-moving party, Mr. Whitney produced sufficient evidence to demonstrate that EDG was an employer for the purposes of Mr. Whitney's TPPA and THRA Claims.

There exists a genuine issue of material fact as to whether EDG exercised sufficient management and control over First Call to be considered an employer . . . .

. . . .

Mr. Whitney has shown that almost on a daily basis a phone conference was held with First Call management and Steve Eaton, managing director of EDG. In those phone conferences[,] decisions affecting every level [of] operations of First Call had to be vetted through and approved by Steve Eaton. Furthermore, the evidence shows that First Call was having financial issues and EDG funded First Call's day-to-day operations. One of the more telling indices of control was when Mike Ross

physically assaulted Mr. Whitney. The first thing his supervisor, Walt Downey, did was to call Justin Starke, Vice President of EDG, and report the same whereupon Mr. Starke travelled to First Call and performed the only investigation of the incident. A genuine issue as to material fact exists that EDG exercised sufficient control to be a joint employer.

Moreover, in the conclusion section of his appellate brief, Appellant asserted the following:

[T]he Trial Court's grant of Defendants' Motion for Summary Judgment as to Mr. Whitney's claims against EDG as a joint employer should be reversed. Reviewing the evidence de novo, and construing the evidence in favor of Mr. Whitney, Mr. Whitney has demonstrated that EDG had sufficient control over the conditions of employment of the employees of First Call, so while EDG was and is a separate entity, it had sufficient control over the employee's conduct so as to be liable as a joint employer.

In the Joint Petition, however, Appellant now asserts that he "did not intend to appeal the dismissal of his claims brought against EDG" and that he "did not intend to proceed as though EDG was a party to this appeal[,]" noting that this "appears to have created confusion regarding the parties to the appeal."

If the Appellant now labels its raising and arguing of this issue as a "mistake," it is an egregious one. In his appellate brief, Appellant argued that the trial court erred in granting summary judgment to EDG, and Appellant explicitly asked this Court to reverse such ruling. This in spite of the fact that counsel for Appellant acknowledged to counsel

for EDG in July 2018 that "First Call is the only appellee party."[1] Appellant's brief on appeal was not filed until September 27, 2018. Moreover, counsel for Appellant at oral argument in February 2019 again failed to notify this Court that he was not pursuing an appeal against EDG, in spite of raising the issue in his appellate brief.

Despite the above actions of Appellant's counsel, both Appellant and EDG acknowledge in the Joint Petition that Appellant did not intend to appeal the dismissal of his claims brought against EDG. Because it appears that Appellant never served a copy of his appellate brief on EDG or its counsel, EDG remained unaware of the claims brought against it in Appellant's brief on appeal. We agree that EDG should not be prejudiced by the actions of Appellant. Accordingly, we hereby vacate our April 15, 2019 Opinion and Judgment. We will file a revised Opinion and Judgment in accordance with this order.

PER CURIAM

---

[1] See: Exhibit 1 to Non-Party EDG Partners, LLC's Unopposed Motion for Leave to Intervene for Purposes of Jointly Petitioning to Correct Opinion and Judgment Regarding Parties to the Appeal.